IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs October 16, 2019

## KALYN POLOCHAK v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Overton County**
**No. 2011-CR-45     David Patterson, Judge**

_____

### No. M2018-01524-CCA-R3-PC

_____

The petitioner, Kalyn Polochak, appeals the denial of her petition for post-conviction relief, which petition challenged her 2012 Overton County Criminal Court jury convictions of first degree premeditated murder, first degree felony murder, conspiracy to commit first degree murder, especially aggravated robbery, and theft of property valued at $1,000 or more but less than $10,000. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Patrick Hayes, Cookeville, Tennessee, for the appellant, Kalyn Polochak.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Owen Burnette, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

An Overton County Criminal Court jury convicted the petitioner of first degree premeditated murder, felony murder in the perpetration of aggravated robbery, conspiracy to commit first degree murder, especially aggravated robbery, and theft of property valued at $1,000 or more but less than $10,000 for her role in the 2010 murder of 72-year-old Hassie Pearl Breeding. *See State v. Kalyn Marie Polochak*, No. M2013-02712-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Nashville, Jan. 16, 2015), *perm. app. denied* (Tenn. May 14, 2015).

The evidence adduced at the petitioner's trial established that the victim, who was the grandmother of the petitioner's boyfriend, co-defendant Benjamin Bowers, died from "asphyxia due to strangulation and smothering." *Id.*, slip op. at 15. At the time of the offenses, the petitioner and Mr. Bowers lived with the victim. *See id.*, slip op. at 2. The victim had expressed dissatisfaction with the living arrangement, telling her daughter that the petitioner had yelled at her and that Mr. Bowers had pushed her. After she was unable to reach her mother over the course of a day, the victim's daughter, Teresa Breeding, drove to the victim's house. The victim's 2006 Toyota Scion was not in the driveway. Ms. Breeding found the victim's body on the floor of the bedroom shared by the petitioner and Mr. Bowers covered with a blanket. A cord was wrapped around the victim's neck, and a pillow covered her face. A $20 bill was found protruding from the victim's sock, and other evidence established that it was the victim's custom to carry her money inside her sock. *See id.*, slip op. at 2-4.

The petitioner and Mr. Bowers, who were suspects very early in the investigation, were eventually located in Indiana. Two days after the murder, paramedics in Grant County, Indiana "responded to a possible drug overdose call" and "learned that the [petitioner] 'shot up . . . nicotine water in a syringe.'" *Id.*, slip op. at 10. The petitioner "was upset and was wearing soaking wet clothes." *Id.* When asked why her clothes were wet, the petitioner said "that she had been in the bathtub at her grandparents' house with her boyfriend and" indicated that she and Mr. Bowers had "put electronic devices in the bathtub attempting to electrocute" themselves. *Id.* She said that she and Mr. Bowers had attempted suicide "because 'they . . . wanted to be together forever.'" *Id.* The petitioner told paramedics "that she lived at her boyfriend's grandmother's house with her mother's consent but that . . . . her mother threatened to have her boyfriend arrested for statutory rape if the [petitioner] did not return home." *Id.*, slip op. at 10-11. The petitioner then said, "'[I]t's never going to be okay, I shouldn't have done it, I shouldn't have hurt her, I just wish I hadn't done it.'" *Id.*, slip op. at 11. The petitioner added, "'[W]e killed her, oh my God, I wish I hadn't done that, oh my God, I wish I hadn't done that.'" *Id.* The petitioner said Mr. Bowers got behind the victim "'took a dog leash and strangled her and I put a pillow on her face and smothered her, oh my God, oh my God, I just wish I hadn't done it.'" *Id.* The petitioner admitted that she had "put the pillow on the victim's face and smothered the victim." *Id.*

The petitioner provided a statement to the police, and it was read to the jury and summarized on appeal:

> When asked for identifying information, the [petitioner] said she had "been [giving] it all day long." She asked if her mother knew what was happening. Sergeant Collins told the [petitioner] that her mother had been told it

-2-

was important for the authorities to speak to the [petitioner]. The [petitioner] had been living with Mr. Bowers at his grandmother's house. On December 10, 2010, her mother called and was upset after receiving a notification she would not receive food stamp benefits if the [petitioner] did not live with her. The [petitioner]'s mother said that she would have Mr. Bowers arrested for statutory rape and that the [petitioner] would be in trouble with the authorities. The [petitioner] might have been pregnant. After the call, the [petitioner] and Mr. Bowers got high by injecting Dilaudid. They discussed going "out with a bang." Mr. Bowers mentioned killing his grandmother. The [petitioner] did not want to see blood and recommended they use a dog leash as a weapon. When the victim came home from work, Mr. Bowers choked her with the leash, and the [petitioner] pushed a pillow on the victim's face. The victim made unusual noises and died after about two minutes. They dragged the victim's body into a bedroom and covered it with bed linens and a pillow. Mr. Bowers took $200 from the victim's body, and they took the victim's car to Indiana to visit the [petitioner]'s relatives. The [petitioner] said she was sorry she had damaged the lives of Mr. Bowers, herself, and her unborn child. On the day she was taken into custody, she had tried to commit suicide three times. She and Mr. Bowers sat in a bathtub and put appliances in the water. They also tried to kill themselves in a car through carbon monoxide inhalation and by injecting nicotine water. She wished she were dead. Near the end of the interview, she asked if she could still have a lawyer.

*Id.*, slip op. at 12.

The petitioner and Mr. Bowers had been driving the victim's Toyota Scion. Inside the vehicle, authorities discovered a black backpack, "a black purse containing keys, a pink cell phone, and a gold watch" along with "a handwritten note signed by" the petitioner in which she declared that Mr. Bowers "is the only person who has . . . ever had my heart like this[.] I love him so much. If you have found this you obviously know what has happened. I want his last name on my grave & I want to be cremated w[ith] him." *Id.*, slip op. at 5 (alterations in original).

The police "theory of the case" was that "Mr. Bowers placed his foot on the victim's back and pulled the dog cord tight around the victim's neck," and statements provided by both the petitioner and Mr. Bowers "supported the theory" as did the discovery of wire cutters and a length of the same "dog cord" used to strangle the victim inside the bedroom shared by the petitioner and Mr. Bowers. *See id.*, slip op. at 6. Forensic testing established the presence of DNA belonging to both the petitioner and Mr. Bowers on the pillow used to suffocate the victim. Mr. Bowers' statement to the police was admitted into evidence and read to the jury:

> In the statement, Mr. Bowers stated that his grandmother allowed him and the [petitioner] to live with her and that the victim treated them well. They used the bedroom across from the bathroom, which had the holes in the walls. He admitted stealing from the victim previously and knew the victim kept her money in a black pouch tucked in her sock. Mr. Bowers' only concerns in life, though, were his drug addiction and the [petitioner].

> On the day of the killing, Mr. Bowers said he and the [petitioner] stayed home, and they talked about how they "could be together." He said, "We figured we would kill my Grandmother and take her money." They packed their belongings before the victim arrived home, and he said the [petitioner] thought of choking the victim with a dog leash. He said the plan was for Mr. Bowers to approach the victim from behind and place the leash around her neck. He said he practiced on the [petitioner] to determine how best to do it. He cut the leash with the wire cutters and left them in their bedroom. He stated, "I guess . . . me and [the petitioner] planned this out even premeditated what we did." When the victim arrived home at 5:30 p.m., Mr. Bowers approached her from behind, placed the leash around her neck, and choked her. He said he wore the black gloves during the attack. He yelled for the [petitioner]'s assistance. The [petitioner] came from their bedroom with a pillow and placed it over the victim's face. The victim fell to the floor as Mr. Bowers applied pressure. As he pulled the leash as tight as possible, the [petitioner] held the pillow over the victim's face. The victim attempted to fight, and Mr. Bowers heard "a little sigh and gurgle." The [petitioner] laid her entire body on the victim and applied pressure on the pillow. After the victim

-4-

was dead, Mr. Bowers took money from the victim's purse. He removed $420 from the victim's right sock. Mr. Bowers and the [petitioner] placed their belongings in the victim's car and left. Mr. Bowers and the [petitioner] bought gas, drove to Sparta to buy $200 worth of drugs, and drove to Indiana.

Mr. Bowers noted the [petitioner] spoke with her mother earlier that day. The [petitioner]'s mother threatened to call the police "to get Kalyn home." Mr. Bowers threw the wire cutters into the bedroom door. He admitted breaking the window in the Blazer when he attempted to remove the window to unlock the door and take the battery. He wanted to put the battery in his car, which would not start. He concluded his statement by saying "this was the only way me and Kalyn could think of being together." He claimed he would have done anything for the [petitioner].

*Id.*, slip op. at 8. A statement provided by the petitioner "referenced the same date and time of the killing, Mr. Bowers' placing the dog cord around the victim's neck, the [petitioner]'s placing a pillow over the victim's face, and the motive for obtaining money and a car to get out of town." *Id.* The petitioner's statement also indicated that she and Mr. Bowers had murdered the victim "because the [petitioner]'s mother threatened to report Mr. Bowers to the police." *Id.*

Other evidence established that the petitioner, who was 17 years old at the time of the offense, suffered from attention deficit and hyperactivity disorder, substance abuse disorder, and post-traumatic stress disorder that was related to the abuse she suffered at the hands of her father. The petitioner reported that Mr. Bowers abused and threatened her and that she was afraid of him. Witnesses testified that the victim was also afraid of Mr. Bowers. *Id.*, slip op. at 16-24.

This court affirmed the petitioner's convictions and accompanying total effective sentence of life imprisonment. *See id.*, slip op. at 55. The petitioner filed a timely petition for post-conviction relief, alleging that she was deprived of the effective assistance of counsel at trial. Among her challenges to trial counsel's performance, she complained "that written statements by Mr. Bowers should not have been read as evidence as it violated her Sixth Amendment Right to cross-examination."

Although the petitioner raised myriad instances of allegedly deficient performance, she indicated at the June 2018 evidentiary hearing that she intended to focus on claims that counsel did not allow her to testify at the suppression hearing, that

-5-

counsel failed to procure the testimony of an expert in abusive relationships, that counsel failed to request DNA analysis of certain evidence, that counsel did not object to the State's violating evidence rule 615, that counsel failed to offer evidence of the petitioner's intoxication during her interrogation, that Mr. Bowers' statement should not have been read to the jury, and that counsel should have requested an independent autopsy. Because the sole issue on appeal is the admission of Mr. Bowers' statement, we will confine our recitation of the evidence offered at the hearing to this issue.

The petitioner did not testify at the evidentiary hearing. Trial counsel testified that he had "a vague remembrance of" the admission of Mr. Bowers' statement but that he could not recall "exactly what those statements said." He also could not recall whether he had objected to the statement's admission. He explained that "the main intent of our strategy" was to blame Mr. Bowers for the murder and that the more evidence counsel could present to "show that he was responsible, the better for our case." In consequence, he said, "I would have to review the exact statement, see exactly what it was to say why I objected or why I didn't object. I don't know the answer to that right now." During cross-examination by the State, trial counsel added:

> I would assume, without now remembering what the statement said, that he basically admitted to the crime. If he did inculpate her, I think one thing we tried to bring up was that he wanted to take her down with him and he would have every reason to do that.

After being allowed to review the portions of Mr. Bowers' statement that had been read to the jury, trial counsel said that he believed the statement supported the theory of the defense, explaining,

> It also supported the fact that [the petitioner] had made the statement . . . that Mr. Bowers and she had gone over what to say when he was threatening to kill her and those kinds of things. So what, what she said he told her to say was in the statement as to what happened. It corroborated it from that extent.

He said there were "[m]ultiple reasons" for allowing the statement into evidence.

The post-conviction court denied relief, finding that the petitioner had failed to prove by clear and convincing evidence facts to support her claims of ineffective assistance of counsel. Relevant to this appeal, the post-conviction court found that trial counsel "did not object to the use of [Mr. Bowers'] statement to law enforcement during

trial. It was a defense strategy to shift blame to [Mr. Bowers] and the use of [his] statement served that purpose."

In this timely appeal, the petitioner asserts that the admission of Mr. Bowers' statement violated her Sixth Amendment right to confront the witnesses against her. The State argues that this claim qualifies as waived under the terms of the Post-Conviction Procedure Act and that the petitioner further waived this issue by failing to present it to the post-conviction court.

Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

"A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). As the State correctly points out, the petitioner did not challenge the admission of Mr. Bowers' statement on Sixth Amendment grounds either at trial or on direct appeal, and, in consequence, it is waived. The State also correctly asserts that the petitioner waived this court's consideration of her claim by failing to present the freestanding Sixth Amendment claim to the post-conviction court. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived."). Finally, we observe that the petitioner's appellate brief contains only a single page of argument that is supported by only a citation of the Sixth Amendment to the United States Constitution. This hardly satisfies the requirements of Tennessee Rule of Appellate Procedure 27, *see* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"), or Rule 10 of the Rules of this court, *see* Tenn. R. Ct. Crim. App. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."), resulting in a waiver of the issue on appeal.

Because the single issue presented for review has been waived, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE